Granovsky & Sundaresh PLLC
Alexander Granovsky, Esq.  (AG-6962)
Benjamin Rudolph Delson, Esq.  (BD-0304)
Granovsky & Sundaresh PLLC
48 Wall Street, 11th Floor
New York, New York 10005
(646) 524-6001
ag@g-s-law.com
delson@g-s-law.com
*Attorneys for Plaintiff Stephen J. Hilton*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHEN J. HILTON,<br><br>　　　　*Plaintiff,*<br><br>　　v.<br><br>DXC TECHNOLOGY COMPANY,<br><br>　　　　*Defendant.* | Civil Action No.:　**19-cv-1157**<br><br>**COMPLAINT & JURY DEMAND** |

Stephen J. Hilton ("Plaintiff" or "Hilton"), through his attorneys Granovsky & Sundaresh PLLC, for his Complaint against DXC Technology Company ("Defendant" or "DXC"), alleges as follows:

**NATURE OF ACTION**

1.　It is a familiar story:  Having gotten the work it wanted from him, an employer refuses to pay an employee what he was promised.

2.　Here the employee is Plaintiff Stephen Hilton, a talented and plainspoken senior executive with a knack for guiding corporations through organizational and technological upheaval.

3.      Here the employer is Defendant DXC, a Fortune 500 company whose predecessor, CSC, hired Hilton in 2015 to help guide it through a corporate turnaround, culminating in the multi-billion dollar merger that first brought DXC into being.

4.      And here the promises are all in writing.  CSC and later DXC paid Hilton a salary coupled to a severance plan.  The severance plan was drafted to ensure that, despite the tumult of an anticipated restructuring or merger, Hilton would provide honest assessments and focus on creating value for shareholders, and would not be distracted by anxieties about his own professional future.

5.      CSC and DXC also granted Hilton substantial awards of stock.  These stock grants were also specifically drafted to give Hilton strong incentives to create value for shareholders during the tumult of a restructuring or merger, and to always provide his own honest assessments, without being distracted by his own professional future.

6.      Hilton was a remarkable asset for CSC and DXC.  Before, during and after the merger, Hilton again and again took on increased responsibilities and found innovative ways to increase shareholder value.  DXC's profitability saw remarkable gains during Hilton's tenure, thanks in very large part to cost savings implemented by Hilton.

7.      But, during the second half of 2017, with the tumult of the merger largely in its past, the CEO of DXC (and direct manager of Hilton), Michael Lawrie, decided to terminate Hilton.

8.      Hilton's opinions about the best course for DXC had occasionally clashed with Lawrie's opinions, and Hilton was the obvious fall guy when Lawrie grew dissatisfied with the structure and performance of DXC after the merger.  These were, of course, suitable reasons to fire Hilton: Hilton was an at-will employee and DXC could fire him at any time for any reason.

9.     In other words, Hilton was now in exactly the situation that his severance agreement and his stock grants had contemplated.   The shareholders of CSC and DXC wanted to ensure that their senior executives always spoke honestly without fear of retaliation, and always charted the most profitable course for the corporation without regard for their own immediate professional future. Hilton had done just those things, and now Lawrie wanted to terminate him.

10.     But the only way DXC could avoid paying Hilton his package would be for Lawrie to fire Hilton for "Cause."  And there was no for-cause basis to fire Hilton.

11.     So, beginning in about the autumn of 2017, Lawrie tried to fabricate a "Cause."  As will be seen, Lawrie couldn't come up with much.  When Lawrie ordered DXC to terminate Hilton in May 2018, the reasons provided for the termination were obvious pretexts.

12.     There is clear evidence of Lawrie's bad faith in the termination.  For example, during the last weeks of Hilton's employment, Lawrie ordered DXC to surreptitiously alter the vesting dates of some of Hilton's stock, to make sure the stock did not vest before Hilton was fired.

13.     Both the severance agreement between Hilton and DXC and the stock grant agreements between Hilton and DXC are clear:   If DXC fired Hilton without "Cause," Hilton was entitled to severance benefits and to the immediate vesting of his stock.  Hilton brings this action to collect the payment he was promised for his work.

## THE PARTIES

### Plaintiff Stephen J. Hilton

14.     Plaintiff STEPHEN J. HILTON is an individual residing in Brooklyn, New York.

15.     In March 2015, Mr. Hilton was hired to be Executive Vice President and General Manager, Global Infrastructure Services, by Computer Science Corporation ("CSC"), a multinational company providing IT and professional services.

16.     In approximately April 2017, CSC underwent a change of control, merging with the Enterprise Services line of business of Hewlett Packard to create Defendant DXC.

17.     After the change in control, Mr. Hilton became Executive Vice President and Head of Global Delivery at Defendant DXC.

18.     For the entirety of his tenure, Mr. Hilton worked at offices maintained by CSC and DXC in New York City.  His employment was subject to the law of the State of New York.

19.     DXC terminated Mr. Hilton effective July 20, 2018.  The termination was without cause.

***Defendant DXC Technology Company***

20.     Defendant DXC TECHNOLOGY COMPANY is a Nevada corporation with its world headquarters (and its corporate "nerve center") at 1775 Tysons Blvd., Tysons, VA 22102.  It also maintains offices at 1 Rockefeller Plaza, New York, NY 10020.

21.     DXC is a Fortune 500 company traded on the New York Stock Exchange under ticker symbol DXC.

22.     According to its website, DXC "is the world's leading independent, end-to-end IT services company, serving nearly 6,000 private and public sector clients from a diverse array of industries across 70 countries. The company's technology independence, global talent and extensive partner network help clients harness the power of innovation to thrive on change and guide their digital transformation journeys."

23.     DXC is the successor to CSC.  Upon the April 2017 change in control, DXC assumed all of CSC's obligations under each of the contracts CSC had entered into with Hilton, as alleged below.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1332(a)(1) & (c)(1), in that the matter in controversy exceeds $75,000.00, Mr. Hilton is a citizen of the State of New York, and DXC is a citizen of the State of Virginia and the State of Nevada.

25.     Venue is proper in this Court in that a substantial part of the events or omissions giving rise to Mr. Hilton's claims occurred in New York City.  Specifically, this action arises from Mr. Hilton's employment and termination by DXC and concerns a dispute about whether or not DXC had any for-cause basis (as defined the relevant contracts) for terminating Mr. Hilton.  Mr. Hilton's place of employment, during his entire tenure with CSC and DXC, was New York City.

## STATEMENT OF FACTS

### I.  CSC Hires Hilton

26.     In late 2014, Stephen Hilton was employed by Credit Suisse, where he was a Managing Director, the CIO of IT Infrastructure, and also the head of Corporate Real Estate and Travel. Hilton had been at Credit Suisse for nearly ten years and was looking for the next step in his career.

27.      A partner at McKinsey & Company, Will Forrest, suggested that Hilton meet Michael Lawrie ("Lawrie"), the CEO of the Computer Science Corporation ("CSC").  Lawrie was hiring a new Executive Vice President and General Manager for CSC's Global Infrastructure Services Business, and Forrest saw that Hilton had the talent for the job.

28.     Hilton met Lawrie for an interview and dinner in December 2014.  Also at the dinner was Joanne Mason ("Mason"), who was Lawrie's Chief of Staff.

29.     The dinner was pleasant, though it had one peculiar moment. Lawrie ordered a steak, but then Lawrie let his subordinate, Ms. Mason, divide up the meat for him.  She took the plate from

her boss and, using her boss's steak knife, split the pre-carved the meat onto a plate for him and for herself, then split the side dish, and then gave the plate back to her boss.

30.    This peculiar moment was a vivid early example of an important feature of Lawrie's personality:  his inability to draw the line between the personal and the professional.  It was also a vivid early demonstration of Lawrie's close dependency on Mason.

31.    Hilton could tell, when the dinner concluded, that Lawrie liked him and wanted him for the position.  After further interviews at CSC's Virginia headquarters in early 2015, CSC offered Hilton, and Hilton accepted, a position as Executive Vice President and General Manager for CSC's Global Infrastructure Services ("GIS").

32.    It was clear, as Hilton negotiated his compensation package with CSC, that CSC wanted to strongly incentivize Hilton to work to create value for CSC's shareholders.  Specifically, CSC was contemplating a sale, merger or other change of control, and CSC wanted to ensure that Hilton would not let concerns for his own professional future interfere with whatever course added the most shareholder value.  CSC's shareholders wanted to ensure that the members of their senior management team felt free to be honest and direct with each other, and would build whatever corporate structure maximized shareholder value, without worrying about their own immediate professional futures.

33.     And so, as part of his compensation, CSC offered Hilton a severance plan and certain stock grants to ensure that Hilton would work as hard as he could for CSC's shareholders, and would speak openly and honestly with his fellow senior managers, without concern for his own future.

34.    Attached as Exhibit P is an offer letter, dated February 20, 2015, from CSC to Hilton. Pursuant to that offer, Hilton's base salary was $650,000 per year, and he would also to be paid

various incentives in the form of stock, including a first round of incentives to be paid in May 2015.

35.     Notably, the February 20 offer letter specifically stated that CSC was contemplating a change in control.  In a paragraph titled "***Change In Control***", the offer letter stated that Hilton and CSC would enter into a Senior Management and Key Employee Severance Agreement (which the offer letter even calls a "Change in Control Agreement").   Hilton and CSC both saw the promises of compensation contained in the Severance Agreement as instrumental to properly incentivizing Hilton's work during the change in control.

36.     Attached as Exhibit Q is the Senior Management And Key Employee Severance Agreement (the "Severance Agreement") between Hilton and CSC, dated March 20, 2015.  The Severance Agreement incorporates by reference a Severance Plan for Senior Management And Key Employees (the "Severance Plan").  The operative version of the Severance Plan is attached as Exhibit R.  (The version of the Severance Plan operative in March of 2015 is attached as Exhibit S.)

37.     Pursuant to the Severance Agreement, Hilton was made a Group B Designated Employee under the Plan.  As a Group B Designated Employee under the Severance Plan, Hilton would be entitled to certain severance benefits in the event: (i) that CSC underwent a change of control; and, (ii) that (A) within 24 months of the change in control Hilton voluntarily ended his employment for "Good Reason" as defined in the plan, or (B) that within 36 months of the change in control Hilton was involuntarily terminated by CSC or it successor for any reason other than for "Cause" as defined in the plan.  See Exhibit R at Paragraph 4; Exhibit S at Paragraph 3.

38.     In May of 2015, as contemplated in the February 20 offer letter, CSC made two stock grants to Hilton:

    a.   On May 22, 2015, CSC granted Hilton the option to purchase 170,909 shares of CSC common stock at $26.58 ("Grant A").  That grant agreement is attached as Exhibit A.  Grant A was made pursuant to the Computer Sciences Corporation 2007 Employee Incentive Plan, which is attached as Exhibit M.

    b.   On May 22, 2015, CSC also granted Hilton 79,093 Restricted Stock Units in CSC ("Grant B").  That grant agreement is attached as Exhibit B.  Grant B was made pursuant to the Computer Science Corporation 2011 Omnibus Incentive Plan, which is attached as Exhibit N.

39.    The stock grants that CSC made to Hilton were similar to the Severance Agreement between CSC and DXC in that they specifically provided for the accelerated vesting of the stock awards in the event of a change in control for CSC.  See Exhibit A at Paragraph 2(d)(ii); Exhibit B at Paragraph 4(d).  These protections ensured that Hilton would be able to speak honestly with his colleagues in senior management, and build whatever structure maximized shareholder value, without needing to worry about his own immediate professional future.

40.    The compensation package that CSC and Hilton negotiated was entirely in line with the magnitude of Hilton's responsibilities:  as Executive Vice President and General Manager for GIS, Hilton would responsible for a division of CSC with an annual P&L of approximately $4 billion, employing approximately 15,000 people around the world.  He would be subject to the reporting requirements of Section 16 of the Securities Exchange Act.

## II. *Corporate Culture under CEO Michael Lawrie*

41.    When Hilton assumed control of GIS, the division had been missing its internal budget, set by Lawrie, by several hundred million dollars a year.  Hilton immediately began making changes, including cancelling programs and refocusing the organization on operational efficiencies.

42.    But it quickly became evident to Hilton that Lawrie's internal budgets were largely aspirational.  For example, while the GIS unit missed the internal budget targets set by Lawrie for GIS both of the first two years Hilton was in charge, Lawrie praised Hilton as a success, both in one-on-one meetings and in before other senior executives in CSC management meetings.

43.    It also became evident to Hilton, by the summer of 2015, that Lawrie's management style was in some respects toxic.  Hilton repeatedly witnessed Lawrie verbally abuse his subordinates, and Hilton repeatedly saw Lawrie make business decisions not based upon metrics and performance, but based upon Lawrie's sense of whether an employee was sufficiently loyal or subservient to Lawrie personally.

44.    Hilton also came to learn that Lawrie had a pattern of terminating subordinates shortly before their stock grants would vest, finding various ways to avoid paying out compensation that was owed.  Lawrie gloated, for example, about how much money (in the form of unvested stock) Steve Hilton's predecessor "left on the table" when CSC fired him.

45.    Hilton himself strove to be honest, efficient and approachable.  He believes he was seen as a confidante, someone other executives could turn to when they had suffered from Lawrie's management style.

46.    Hilton also built a reputation within CSC for conceiving and executing creative business deals (especially with CSC's IT vendors) to increase CSC's profitability, something that can be particularly important to a company actively contemplating a change in control.  To provide one typical example among many, one early transaction led by Hilton, called Zircon, saved CSC $35 million in operating expenses a year for five years.  Such deals won repeated praise from Lawrie.

47.    CSC repeatedly rewarded Hilton for his hard work:

a. On December 15, 2015, CSC granted Hilton 88,106 Restricted Stock Units in CSC ("Grant C").  That grant agreement is attached as Exhibit C.  Grant C was made pursuant to the Computer Science Corporation 2011 Omnibus Incentive Plan, which is attached as Exhibit N.

b. On May 27, 2016, CSC granted Hilton the option to purchase 89,965 shares of CSC common stock at $49.24 ("Grant D").  That grant agreement is attached as Exhibit D.  Grant D was made pursuant to the Computer Science Corporation 2011 Omnibus Incentive Plan, which is attached as Exhibit N.

c. On May 27, 2016, CSC also granted Hilton 26,202 Restricted Stock Units in CSC ("Grant E").  That grant agreement is attached Exhibit E.  Grant E was made pursuant to the Computer Science Corporation 2011 Omnibus Incentive Plan, which is attached as Exhibit N.

d. On May 27, 2016, CSC also granted Hilton 4852 Restricted Stock Units in CSC ("Grant F").  That grant agreement is attached Exhibit F.  Grant F was made pursuant to the Computer Sciences Corporation 2007 Employee Incentive Plan, which is attached as Exhibit M.

e. On May 27, 2016, CSC also granted Hilton 8734 Restricted Stock Units in CSC ("Grant G").  That grant agreement is attached Exhibit G.  Grant G was made pursuant to the Computer Science Corporation 2011 Omnibus Incentive Plan, which is attached as Exhibit N.

48.    Again, the stock grants that CSC made to Hilton were similar to the Severance Agreement between CSC and DXC in that they specifically provided for accelerated vesting of the stock awards in the event of a change in control for CSC.  See Exhibit C at Paragraph 4(d); Exhibit D at

10

Paragraph 2(d)(ii); Exhibit E at Paragraph 4(d); Exhibit F at Paragraph 3(e); and Exhibit G at Paragraph 4(d).

### III. The Change In Control

49.     Throughout 2015 and 2016, the Board of CSC was contemplating a merger with several potential partners, including the Enterprise Services division of Hewlett Packard.

50.     The Enterprise Services division of Hewlett Packard was under-performing and substantial cuts would have to be made to that division in order for a merger to be successful.   The negotiations ebbed and flowed, with the merger publicly announced in May 2016 and successfully concluded in April 2017.

51.     From May 2016 through April of 2017, Hilton was one of a small set of CSC executives who had to both run CSC and orchestrate the merger.   It was a time of exceptional demands and sacrifice for all involved, Hilton very much included.

52.      The merger, as it was finally consummated, was a so-called "Reverse Morris Trust": Hewlett Packard spun off its Enterprise Services division into a new company, which then purchased CSC to form DXC.  The merger constituted a change in control for CSC.  The fact that the merger constituted a change in control was made explicit, among other places, in Hilton's Severance Plan, a document filed by DXC with the SEC.  See Ex. R at Paragraph 2(b).

53.     The change in control triggered the vesting of some of the stock CSC had granted to Hilton. By May 27, 2017 Grant A, Grant B and Grant F had been distributed in full to Hilton.

54.     The change in control also changed the nature of Hilton's remaining stock grants: Hilton's grants of stock in CSC converted to grants of stock in DXC, and Hilton's grants of options to purchase CSC stock converted to grants of options to purchase DXC stock.  CSC and DXC stock were valued 1:1.

55.    DXC recognized the substantial sacrifices Hilton had made between May 2016 and April 2017 for the benefit of its shareholders and wanted to continue to incentivize his hard work going forward:

a.   On May 31, 2017, DXC granted Hilton 9,577 Restricted Stock Units in DXC ("Grant H").  That grant agreement is attached Exhibit H.  Grant H was made pursuant to the DXC Technology Company 2017 Omnibus Incentive Plan, which is attached as Exhibit O.

b.   On May 31, 2017, DXC granted Hilton 16,759 Restricted Stock Units in DXC ("Grant I").  That grant agreement is attached Exhibit I.  Grant I was made pursuant to the DXC Technology Company 2017 Omnibus Incentive Plan, which is attached as Exhibit O.

c.   On May 31, 2017, DXC granted Hilton 5,586 Restricted Stock Units in DXC ("Grant J").  That grant agreement is attached Exhibit J.  Grant J was made pursuant to the DXC Technology Company 2017 Omnibus Incentive Plan, which is attached as Exhibit O.

d.   On June 15, 2017, DXC granted Hilton 3,181 Restricted Stock Units in DXC ("Grant K").  That grant agreement is attached Exhibit K.  Grant K was made pursuant to the DXC Technology Company 2017 Omnibus Incentive Plan, which is attached as Exhibit O.

e.   On June 15, 2017, DXC granted Hilton 18,272 Restricted Stock Units in DXC ("Grant L").  That grant agreement is attached Exhibit L.  Grant L was made pursuant to the DXC Technology Company 2017 Omnibus Incentive Plan, which is attached as Exhibit O.

### *IV. Hilton's Prominent Role at DXC*

56.     Lawrie became CEO of the newly formed DXC.

57.     Through the entire merger process, Lawrie leaned heavily on outside consultants to advise on the structure of the new company.  For example, during the merger process, CSC spent in excess of $40 million for services from McKinsey & Co. ("McKinsey"), and also retained Heidrick & Struggles ("Heidrick") as a talent recruiter and advisor.

58.     Through these outside consultants, Lawrie and Mason (who was still his Chief of Staff, and who had also been appointed as the Chief Human Resources Officer of CSC) took the lead roles in sculpting the corporate structure of the new DXC.

59.     Lawrie wanted a so-called "functional model" for DXC, with corporate operations organized into three divisions by function:  "Build," "Sell" and "Deliver."   Each of these three divisions would be headed by an EVP:  "Build" by Eric Harmon (who ultimately left DXC in the 1st Quarter of 2018), "Sell" by Mike Nefkins (who also ultimately left DXC in the 1st Quarter of 2018), and "Deliver" by Steve Hilton.

60.     Lawrie described this new model as radical for a services company, something he had never previously implemented.  Lawrie stated that "time would tell" if this new model worked.

61.     Hilton's title, effective after the merger, was Executive Vice President, Head of Global Delivery.  His salary was raised to $700,000 a year.

62.     As Head of Global Delivery, Hilton would manage approximately 120,000 DXC employees worldwide plus approximately 60,000 contractors, with a total expense base of approximately $14 billion across 6000 clients and 70 countries.  Except for the CEOs themselves, there not many executives at any Fortune 500 company in the world with a portfolio larger than Hilton's.

63.    Indeed, Hilton was formally named in the CSC / DXC "succession plan" as a candidate to replace Lawrie as CEO in the event of Lawrie's death or departure.

64.    Functionally speaking, DXC's "Deliver" division served as a cost center for its "Sell" and "Build" divisions.  This meant that approximately three-quarters of DXC's personnel would be employed within Global Delivery and would provide much of the support to the staff in sales, who were divided by DXC into nine major sales divisions (six divisions dedicated to six global regions, and three major divisions dedicated to specific industries: insurance, health care and the U.S. public sector).

65.    Lawrie and Hilton both agreed that Global Delivery's expenses should be cut.  In particular, because Global Delivery would control most of DXC's workforce, most of the workforce cuts that DXC hoped to implement would need to come from the Global Delivery team.  These cuts would need to be accomplished without causing any significant loss to the quality of the service that Global Delivery provided to DXC's clients.

66.    In rough numbers, Hilton and Lawrie agreed that Global Delivery could ultimately achieve approximately $2.7 billion in annual savings, including through major workforce reductions.

67.    Hilton knew there would be no way for Global Delivery to achieve those savings immediately; in other words, Hilton knew there was no way for Global Delivery to spend $2.7 billion less in the first twelve months after the merger than its constituent entities had spent in the twelve months leading up to the merger.  It takes time to fire employees, and the savings that result from terminating an employee only begin to be realized after the employee is terminated.  Also, reducing asset-heavy fixed costs on a balance sheet (e.g. excess capacity in computer devices, storage and data centers) takes considerable time and accounting efforts.  Furthermore, it was people employed by Global Delivery who provided customer support to the clients won for DXC

by sales.   Precipitous cuts in Global Delivery could be disastrous for DXC's long-term revenue, because those cuts would have a direct impact on customer satisfaction, a point routinely expressed to Hilton by his "Sell" and 'Build' peers.

68.     But Lawrie's internal budget targets demanded that Global Delivery achieve approximately $2.7 billion in savings in the first twelve months after the merger; in other words, Lawrie's budget, if implemented, would require Global Delivery to terminate enough people over the course of twelve months that, by the end of those twelve months, Global Delivery would have spent approximately $2.7 billion less than in the preceding twelve months.   To meet Lawrie's internal budget target, Global Delivery would have to fire far more people far more quickly, with the resulting negative impact on customer satisfaction.

69.     Hilton repeatedly advised Lawrie about his reservations concerning the pace of cuts.   Upon information and belief, Lawrie understood that workforce reductions could not be achieved at the pace required by his internal budget without negative impacts on customer satisfaction.   Upon information and belief, Lawrie understood his own internal budget to be merely aspirational and a tool to reduce internal debate.

70.      In fact, the cuts achieved by Hilton in Global Delivery met the expectations of Wall Street analysts who followed DXC's performance.   The cuts achieved by Hilton were instrumental in the remarkable increases in earnings per share that DXC experienced in the first five quarters after the merger.

71.     Throughout the merger process, Lawrie positioned his Chief of Staff, Joanne Mason, to become head of the new Human Resources Department at DXC.   Mason directed McKinsey to go through many iterations of organizational and personnel plans for the new company.   Hilton felt the process she ran was chaotic and non-collaborative and that many of the decisions were sub-

optimal for the future success of DXC. Hilton expressed his concerns to consultants from McKinsey; after all, he would become the leader of approximately 120,000 people affected by each of those organizational decisions.

72.    Hilton noticed a sharp deterioration in his relationship with Mason at this time. Before the merger efforts, they had a fine working relationship, and would even occasionally meet for drinks. After the merger, she barely engaged with him.

73.    Upon information and belief, consultants from McKinsey relayed to Mason that Hilton was frustrated with Mason's processes, and Mason took it personally. Upon information and belief, Mason shared her distaste for Hilton with Lawrie, with whom she continued to share a close and dependent relationship.

74.    Hilton observed that Lawrie's treatment of many of his subordinates grew worse under the stress of the merger and its aftermath. DXC executives who had come from Hewlett Packard were often taken aback by the conduct of their new CEO. Several such executives approached Hilton separately for advice about how to handle Lawrie and Mason, whom they quickly came to see was very close to Lawrie.

75.    Hilton was an obvious choice of a confidante: He is a calm man, compassionate and honest. Hilton felt it was his responsibility to be candid about Lawrie's strengths and weaknesses as a leader. These conversations were one-on-one or in very small groups, were limited to senior management, and were always professional in tone. In other words, they were the run-of-the-mill interactions that occur daily in every large organization as coworkers navigate their workplace relationships.

76.    But soon Hilton himself became the target of Lawrie's particular brand of bullying.  Shortly after the merger, early in the second quarter of 2017, Hilton and Lawrie met for dinner.  It would be their last such one-on-one dinner, and it was alarming.

77.    Upon information and belief, Lawrie had heard, second-hand, about concerns that Hilton had voiced to McKinsey, to Heidrick, and to former Hewlett Packard executives.  Upon information and belief, Lawrie wanted to test Hilton's loyalty to him personally—again, because for Lawrie, personal feelings take precedence over appropriate professional conduct.

78.    Over that dinner in 2Q 2017, Lawrie told Hilton that the merger was <u>not</u> a change in control.

79.    Lawrie told Hilton that, to the extent any former CSC employee's stock had vested as a result of the merger, that vesting had <u>only</u> occurred on Lawrie's say-so, <u>not</u> because there have been a change in control event.

80.    These statements by Lawrie were direct contradictions of publicly reported facts.  For example, as discussed above, the fact that the merger constituted a change in control was made explicit in the new DXC Severance Plan, which had been filed with the SEC.

81.    Hilton was taken aback by Lawrie's brazen lie.  But Hilton saw it for what it was.  Lawrie was testing Hilton's loyalty, testing whether Hilton could be bullied, whether Hilton would stand up for his own interests (in his stock grants and severance rights) in the face of his boss's lies.  Lawrie was also threatening Hilton, saying that as Hilton's boss he would not be constrained by contracts, that he would order DXC to deprive Hilton of his rights to pay and severance if and when it suited him.

82.    Hilton reported this conversation to friends and colleagues contemporaneously, including Will Forrest.

*V. DXC Terminates Hilton Without Cause*

83.     In the months after the merger, Hilton continued to contribute exceptional value to DXC shareholders.  In rough numbers, during approximately his first year as Head of Global Delivery, he reduced Global Delivery's workforce by approximately twenty percent worldwide, with further reductions and savings underway, including hundreds of millions of dollars of reductions in annual IT expenditures driven by processes Hilton personally implemented.

84.     To cite just one example, Hilton conceived and launched a program called DXC Bionix, based out of an earlier initiative Hilton had launched at CSC called Operational Data Mining. Bionix revolutionized how DXC ran its IT operations, and allowed DXC to eliminate approximately 8,000 "man-years" of work (with a corresponding reduction of the workforce) in 2017, all with minimal negative impact to service quality.  Bionix will allow DXC to reduce its workforce by approximately 8,000 more in 2018, with total savings of $445 million per year. Bionix has been among DXC's most successful internal initiatives, and is something Lawrie repeatedly boasted about in earnings calls and to DXC clients.

85.     Because of his successes—and because of his appearances at Investor Days and at the Client Advisory Board—Hilton's profile was rising outside DXC.  Upon information and belief, Lawrie believed Hilton was contemplating leaving DXC for opportunities elsewhere, a violation of the personal subservience and loyalty that Lawrie prized so highly.  And so, before DXC was even six months old, Lawrie made clear that he intended to force Hilton out.

86.     Beginning in about the third quarter of 2017, Lawrie again and again took actions to thwart Hilton's ability to excel.

18

87.     For example, Lawrie largely ceased interacting with Hilton one-on-one, an astonishing way for a CEO to handle his relationship with the Executive Vice President responsible for approximately three-quarters of the company's employees and costs.

88.     Or, for example, Lawrie began moving the goal posts for Global Delivery in ways apparently calculated to ensure Hilton's failure.  In one instance dating to September and October 2017, Lawrie gave Hilton one set of targets for workforce reductions in the U.K. and Ireland region team and in the North Central Europe region team—and then, two weeks later, nearly doubled the size of the expected cuts and said he expected those cuts to happen within just weeks.

89.     It was immediately clear to Hilton that Lawrie was trying to create a "paper trail," that Lawrie was deliberately moving the goal posts on Hilton in order to fabricate grounds for firing Hilton for "Cause."  Indeed, Hilton recorded his impressions in contemporaneous notes to himself; he knew he was being set up, and it made him sick to his stomach.

90.     Or, for example, in approximately November 2017, Lawrie asked for a reorganization of Global Delivery, and the resulting structure, announced in January 2018, eliminated all but four of Hilton's direct reports, and consolidated the vast majority of the Global Delivery organization under a one of his direct reports, Samson David.

91.     While Samson David nominally reported to Hilton, in fact Lawrie treated Samson as the new de facto head of Global Delivery.  For example, Lawrie and Mason held one-on-one meetings with David, but not Hilton, and consultants from McKinsey stopped having project management meetings with Hilton, and met only with David.  Indeed, David even declined to attend meetings called by Hilton, who was nominally his superior.

92.     Throughout DXC, the Global Delivery reorganization and Mr. David's appointment were interpreted to mean just one thing:  "Steve Hilton is out."  In other words, it was understood

throughout DXC that, by January 2018, DXC was doing everything in its power to render its own Executive Vice President redundant.

93.     Hilton expressed his concerns about this reorganization, and Lawrie shrugged them off, telling Hilton, "You need to decide if you leave or stay."  Upon information and belief, Lawrie knew that if he fired Hilton, it would not be for "Cause."

94.     DXC's Human Resources Department took no steps to assist in the situation.  It is an astonishing institutional failure for any HR Department not to intervene in a deteriorating relationship between a CEO and an Executive Vice President responsible for approximately three-quarters of a company's employees and costs—except that at DXC, Human Resources was run by Mason, who had that close and dependent relationship with Lawrie.

95.     Even under this exceptional and direct pressure from his own CEO, Hilton continued to provide exceptional value for DXC shareholders.  To cite just one example, in March 2018 he launched a Global NTCOW Initiative list, based on his personal ideas and institutional knowledge. If implemented, this initiative list will drive $250 million in annual cost savings for DXC.

96.     But none of this was enough.  Lawrie had made up his mind.

97.     On May 15, 2018, Lawrie called a meeting with Steve Hilton at DXC's headquarters in Virginia.  Also present at the meeting was DXC's General Counsel, William Deckelmen.  At the meeting, Hilton was given a letter, attached as Exhibit T.  The May 15 letter informed Lawrie that he had committed both "material misconduct" and a "substantial and willful failure" to render services, and that these constituted grounds for termination for "Cause."

98.     The May 15 letter cited several supposed reasons for Hilton's termination.  All of those reasons were pretexts; Lawrie simply didn't want to work with Hilton any more.  And none of those reasons constituted "Cause"; they were all issues relating to Hilton's performance, and a

termination for performance would not be a termination for "Cause."  (Indeed, the topic sentence of the second paragraph of the May 15 letter, the paragraph in which Lawrie cited the supposed reasons for Hilton's termination, reads: "On a number of occasions in the past year I have made clear to you my dissatisfaction with your performance as a leader of DXC.")

99.     The reasons for Hilton's termination, as cited by the May 15 letter, were:

a.  *Failure to meet the target in Lawrie's budget for spending cuts within the Global Delivery division.*  Senior executives at DXC consistently missed the targets set by Lawrie's internal budgets.  Lawrie's internal budgets were universally understood to be purely aspirational.  Indeed, the rule set for regional bonus payouts was that if Lawrie promulgated a budget requiring a given department to generate $X in revenue and profit, the head of that department and their regional management would receive an annual bonus as long as they achieved 80% of $X.   So, in 2018, at the same time Lawrie claimed to be dissatisfied with the level of cuts achieved by Global Delivery, DXC was paying bonuses to most of the heads of the six regional sales divisions and two industry-based sales divisions serviced by Global Delivery, none of whom had met their budgeted revenue or profit targets.  If Hilton did not meet Lawrie's target budget, it was a performance issue, and not a basis for firing for "Cause".

b.  *Problems in DXC's relationship with AWS (Amazon Web Services), for whom Hilton served as "Partner Executive."*  As Lawrie understood, Hilton was also the "Partner Executive" for Dell EMC, one of the strongest partnerships DXC enjoyed; as Lawrie understood, Hilton was a gifted Partner Executive, and the AWS relationship with DXC was complicated by factors well outside any one person's

control.  Indeed, Hilton had launched the "Icelander" initiative with AWS, and Lawrie himself had then installed a man named Jim Smith to run Icelander.  Smith and Hilton had devoted a full week of their time to AWS, travelling to Seattle to manage the relationship. Hilton supported Smith and his team in Icelander discussions through numerous meetings and contract reviews.  If Hilton did not meet Lawrie's expectations for AWS, it was a performance issue, and not a basis for firing for "Cause".

c.  *Problems with "insubordination" and "morale."*  As Lawrie knows, his leadership style is abrasive at best; by May 2018 Hilton was the only Executive Vice President left among the three original heads of "Build," "Sell," and "Deliver."  The notion that the occasional, run-of-the-mill pep talks Hilton had with other executives about Lawrie had a material affect on morale or constituted insubordination is silly.  (And, to be clear, contrary to the May 15 letter, Hilton never told anyone that he was "trying to get fired.")  If Hilton did not meet Lawrie's expectations about how deferential a subordinate should be, it was at most a performance issue, and not a basis for firing for "Cause".

100.    The May 15 letter represented that Hilton would be given 60 days to cure his supposed performance issues.  Upon information and belief, this representation was made in bad faith.  Upon information and belief, Lawrie and DXC had already determined, on May 15, 2018, that Hilton would be terminated for "Cause" on or about July 20, 2018, no matter what he did or did not do during the supposed 60-day cure period.

101.    During those sixty days, DXC made no good faith effort to assist Hilton in curing his supposed performance issues.

102.     To the contrary, upon information and belief, Lawrie and DXC only purported to provide this 60-day cure period in a bad faith effort to avoid their obligations under the Severance Agreement and Hilton's various stock grants.

103.     Indeed, bizarrely, and in further evidence of the bad faith in which is was written, the May 15 letter even asserts that Hilton's termination will be effective May 15 even though he will be expected to work for sixty days after May 15.

104.     In June 2018, DXC spun off its U.S. Public Sector unit.  As part of that transaction, DXC underwent a stock split, so that every DXC shareholder held approximately 15.6% more shares post-transaction than pre-transaction.  The stock grants that Hilton had been awarded by CSC and DXC were also adjusted, to that after the transaction Hilton held approximately 15.6% more options to purchase DXC stock and restricted stock units in DXC than Hilton had held before.

105.     On July 17, 2018, DXC provided a letter to Hilton terminating him.  That letter is attached as Exhibit U.

***Lawrie's Bad Faith Alteration of Hilton's Stock Vesting Dates***

106.     Upon his termination, Hilton was not paid what CSC and DXC promised.  Hilton was paid none of the benefits promised under his Severance Agreement, and all of his outstanding Restricted Stock Units and Stock Options were cancelled.

107.     The way in which some of his stock grants were cancelled offers clear proof that Lawrie and DXC were acting in bad faith in their termination of Hilton.

108.     After receiving the May 15 letter, Hilton kept a close watch on his stock grants, which were managed by Fidelity.  Certain tranches of Hilton's stock were scheduled to vest either in late May or mid-June of 2018—and Hilton observed that someone had altered the vesting dates

of every one of those tranches.  Specifically, the vesting dates were altered to July 27, 2018, just beyond the 60-day cure period provided in the May 15 letter.

109.    Hilton contacted Fidelity, the broker for his DXC stock grants, to inquire why this change had been made.  Fidelity informed Hilton that the change had been made upon the unilateral instruction of DXC.

110.    Upon information and belief, DXC's instruction to alter the vesting dates of Hilton's stock was without contractual or other legal authority.

111.    Upon information and belief, the Compensation Committee contemplated by the DXC Technology Company 2017 Omnibus Incentive Plan functioned, at best, as a rubber stamp for Lawrie, and exercised no meaningful independent oversight of the decision, in spring 2018, to unilaterally alter the vesting dates of Hilton's grants of stock.

112.    Upon information and belief, Lawrie had decided to characterize Hilton's termination as for "Cause," and had decided to cause Hilton's stock vesting dates to be postponed, because Lawrie knew DXC owed Hilton in excess of $20 million in compensation.

113.    Upon information and belief, Lawrie hoped to force Hilton to "leave money on the table" when Hilton left DXC—just as Lawrie boasted he had done with Hilton's predecessor.

***A Note Regarding The Severance Agreement***

114.    Through this lawsuit, Mr. Hilton seeks to receive the compensation that DXC—having terminated Mr. Hilton without cause—is now obligated to pay Mr. Hilton under certain of Mr. Hilton's stock grants.

115.    Because he was terminated without cause, Mr. Hilton is also entitled to compensation under the Severance Agreement.  The Severance Agreement contains a mandatory arbitration clause, and Mr. Hilton's claims pursuant to that Severance Agreement are not part of this lawsuit.

## COUNT ONE
**Breach of Contract:  Grant C**

116.    Plaintiff Stephen J. Hilton repeats, re-alleges and incorporates by reference the foregoing allegations as if set forth fully and again herein.

117.    On or about December 15, 2015, CSC and Hilton entered into a valid and binding contract pursuant to which CSC granted Hilton 88,106 Restricted Stock Units in CSC ("Grant C").  That grant agreement is attached as Exhibit C.  Grant C was made pursuant to the Computer Science Corporation 2011 Omnibus Incentive Plan, which is attached as Exhibit N.

118.    Grant C had a Vesting Date of December 15, 2018.

119.    In April 2017, CSC underwent a "Change of Control," as that term is defined in the Computer Science Corporation 2011 Omnibus Incentive Plan, when it merged with a spin-off of HP Enterprise to become DXC.  Upon that Change in Control, DXC assumed all of CSC's obligations under Grant C, and the 88,106 in Restricted Stock Units in CSC that Hilton had been granted pursuant to Grant C became 88,106 Restricted Stock Units in DXC.

120.     In June 2018, DXC spun off its U.S. Public Sector unit.  Upon information and belief, upon the consummation of that transaction, the 88,106 Restricted Stock Units in DXC Hilton had been granted pursuant to Grant C were adjusted to 101,868 Restricted Stock Units in DXC.

121.    In July 2018, Hilton experienced a "Qualifying Termination" as that term is defined in the grant agreement for Grant C; specifically, DXC terminated Hilton without "Cause" as that term is defined in the grant agreement for Grant C.

122.    Pursuant to paragraph 4(d)(i) of the grant agreement for Grant C, because Hilton experienced a Qualifying Termination on or after the date of the Change in Control and before the Vesting Date, his 101,868 Restricted Stock Units in DXC should have vested immediately as of the date of his termination.

123.    However, rather than cause and/or permit those Restricted Stock Units to vest as required by the grant agreement, DXC cancelled and/or deleted the 101,868 Restricted Stock Units in DXC that Hilton had been granted pursuant to Grant C.

124.    Hilton fully performed all of his obligations under Grant C.

125.    DXC breached its obligations under Grant C, including but not limited to the covenant of good faith and fair dealing implied in that agreement.

126.    Hilton has been damaged by DXC's breach of Grant C in an amount to be determined at trial but believed to be not less than $8,866,590.72.

## COUNT TWO
### Breach of Contract:  Grant D

127.    Plaintiff Stephen J. Hilton repeats, re-alleges and incorporates by reference the foregoing allegations as if set forth fully and again herein.

128.    On or about May 27, 2016, CSC granted Hilton the option to purchase 89,965 shares of CSC common stock at an exercise price of $49.24 per share ("Grant D").  That grant agreement is attached as Exhibit D.  Grant D was made pursuant to the Computer Science Corporation 2011 Omnibus Incentive Plan, which is attached as Exhibit N.

129.    Grant D had three vesting dates:  subject to the terms of Grant D, one third of the options would vest on May 27, 2017, one third of the options would vest on May 27, 2018, and one third of the options would vest on May 27, 2019.

130.    In April 2017, CSC underwent a "Change of Control," as that term is defined in the Computer Science Corporation 2011 Omnibus Incentive Plan, when it merged with a spin-off of HP Enterprise to become DXC.  Upon that Change in Control, DXC assumed all of CSC's obligations under Grant D.

131.    Pursuant to 2(d)(ii) of the grant agreement for Grant D, upon a Change in Control, "one-third of the Option then outstanding that has not vested on or prior thereto shall fully vest."  And in fact, in April 2017, one third of the options to purchase common stock in DXC that Hilton had been granted pursuant to Grant D did vest.  Hilton subsequently exercised those options.

132.    Upon information and belief, upon that Change in Control, the options to purchase common stock in CSC that Hilton had been granted pursuant to Grant D became approximately 24,000 restricted stock-units in DXC, one half of which were to vest on May 27, 2018 and one half of which were to vest on May 28, 2019.

133.    In about May 2018, DXC unilaterally altered the vesting dates of the restricted stock-units that Hilton had been granted pursuant to Grant D.  Specifically, as to those units that were to vest on May 27, 2018, DXC unilaterally changed the vesting date to July 27, 2018.  Nothing in the grant agreement for Grant D or in the Computer Science Corporation 2011 Omnibus Incentive Plan permitted such an alteration of the vesting date.

134.     In June 2018, DXC spun off its U.S. Public Sector unit.  Upon information and belief, upon the consummation of that transaction, the number of the restricted stock-units in DXC that Hilton had been granted pursuant to Grant D was adjusted to 28,448 Restricted Stock Units in DXC, with one half vesting (due to DXC's improper alteration of the date) on July 27, 2018, and one half vesting in May 2019.

135.    On or about July 20, 2018, DXC terminated Hilton without "Cause" as that term is defined in the grant agreement for Grant D.

136.    Pursuant to paragraph 2(d)(ii) of the grant agreement for Grant D, because Hilton was terminated without Cause after a Change in Control and before his restricted stock units had vested

in full, all the unvested restricted stock units that Hilton had been granted pursuant to Grant D should have automatically vested in full upon his termination.

137.    However, rather than cause or permit the 28,448 unvested restricted stock units that Hilton had been granted pursuant to Grant D to vest, DXC cancelled and/or deleted those restricted stock units.

138.    Hilton fully performed all of his obligations under Grant D.

139.    DXC breached its obligations under Grant D including but not limited to the covenant of good faith and fair dealing implied in that agreement.

140.    Hilton has been damaged by DXC's breach of Grant D in an amount to be determined at trial but believed to be not less than $2,476,113.92.

<u>**COUNT THREE**</u>
**Breach of Contract:  Grant E**

141.    Plaintiff Stephen J. Hilton repeats, re-alleges and incorporates by reference the foregoing allegations as if set forth fully and again herein.

142.    On or about May 27, 2016, CSC granted Hilton 26,202 Restricted Stock Units in CSC ("Grant E").  That grant agreement is attached Exhibit E.  Grant E was made pursuant to the Computer Science Corporation 2011 Omnibus Incentive Plan, which is attached as Exhibit N.

143.    In April 2017, CSC underwent a "Change of Control," as that term is defined in the Computer Science Corporation 2011 Omnibus Incentive Plan, when it merged with a spin-off of HP Enterprise to become DXC.  Upon that Change in Control, DXC assumed all of CSC's obligations under Grant E.

144.    Pursuant to paragraph 4(d)(i) of the grant agreement for Grant E, upon a Change in Control one half of the units Hilton was granted pursuant to Grant E would vest.  And in fact, in May 2017, one half of those units did vest.

28

145.    Upon information and belief, upon that Change in Control, the remaining unvested Restricted Stock Units in CSC that Hilton had been granted pursuant to Grant E became Restricted Stock Units in DXC, with one half vesting on May 27, 2018 and one half vesting on May 27, 2019.

146.    In about May 2018, DXC unilaterally altered the vesting dates of the restricted stock-units that Hilton had been granted pursuant to Grant E.  Specifically, as to those units that were to vest on May 27, 2018, DXC unilaterally changed the vesting date to July 27, 2018.  Nothing in the grant agreement for Grant E or in the Computer Science Corporation 2011 Omnibus Incentive Plan permitted such an alteration of the vesting date.

147.     In June 2018, DXC spun off its U.S. Public Sector unit.  Upon information and belief, upon the consummation of that transaction, the remaining unvested Restricted Stock Units in DXC Hilton had been granted pursuant to Grant E were adjusted to 15,146 Restricted Stock Units in DXC, with one half vesting (due to DXC's improper alteration of the date) on July 27, 2018, and one half vesting in May 2019.

148.    On or about July 20, 2018, DXC terminated Hilton without "Cause" as that term is defined in the grant agreement for Grant E.

149.    Pursuant to paragraph 4(d)(i) of the grant agreement for Grant E, because Hilton was terminated without Cause after a Change in Control and before his restricted stock units had vested in full, all the unvested restricted stock units that Hilton had been granted pursuant to Grant E should have automatically vested in full upon his termination.

150.    However, rather than cause or permit the 15,146 unvested restricted stock units that Hilton had been granted pursuant to Grant E to vest, DXC cancelled and/or deleted those restricted stock units.

151.    Hilton fully performed all of his obligations under Grant E.

152.    DXC breached its obligations under Grant E, including but not limited to the covenant of good faith and fair dealing implied in that agreement.

153.    Hilton has been damaged by DXC's breach of Grant E in an amount to be determined at trial but believed to be not less than $1,318,307.84

## COUNT FOUR
### Breach of Contract:  Grant G

154.    Plaintiff Stephen J. Hilton repeats, re-alleges and incorporates by reference the foregoing allegations as if set forth fully and again herein.

155.    On or about May 27, 2016, CSC granted Hilton 8734 Restricted Stock Units in CSC ("Grant G").  That grant agreement is attached Exhibit G.  Grant G was made pursuant to the Computer Science Corporation 2011 Omnibus Incentive Plan, which is attached as Exhibit N.

156.    In April 2017, CSC underwent a "Change of Control," as that term is defined in the Computer Science Corporation 2011 Omnibus Incentive Plan, when it merged with a spin-off of HP Enterprise to become DXC.    Upon that Change in Control, DXC assumed all of CSC's obligations under Grant G.

157.    Pursuant to paragraph 4(d)(i) of the grant agreement for Grant G, upon a Change in Control one half of the units Hilton was granted pursuant to Grant G would vest.  And in fact, in May 2017, one half of those units did vest.

158.    Upon information and belief, upon that Change in Control, the remaining unvested Restricted Stock Units in CSC that Hilton had been granted pursuant to Grant G became Restricted Stock Units in DXC, with one half vesting on May 27, 2018 and one half vesting on May 27, 2019.

159.    In about May 2018, DXC unilaterally altered the vesting dates of the restricted stock-units that Hilton had been granted pursuant to Grant G.  Specifically, as to those units that were to vest

on May 27, 2018, DXC unilaterally changed the vesting date to July 27, 2018.  Nothing in the grant agreement for Grant G or in the Computer Science Corporation 2011 Omnibus Incentive Plan permitted such an alteration of the vesting date.

160.   In June 2018, DXC spun off its U.S. Public Sector unit.  Upon information and belief, upon the consummation of that transaction, the remaining unvested Restricted Stock Units in DXC Hilton had been granted pursuant to Grant G were adjusted to 5,048 Restricted Stock Units in DXC, with approximately one half vesting (due to DXC's improper alteration of the date) on July 27, 2018, and approximately one half vesting in May 2019.

161.   On or about July 20, 2018, DXC terminated Hilton without "Cause" as that term is defined in the grant agreement for Grant G.

162.   Pursuant to paragraph 4(d)(i) of the grant agreement for Grant G, because Hilton was terminated without Cause after a Change in Control and before his restricted stock units had vested in full, all the unvested restricted stock units that Hilton had been granted pursuant to Grant G should have automatically vested in full upon his termination.

163.   However, rather than cause or permit the 5,048 unvested restricted stock units that Hilton had been granted pursuant to Grant G to vest, DXC cancelled and/or deleted those restricted stock units.

164.   Hilton fully performed all of his obligations under Grant G.

165.   DXC breached its obligations under Grant G, including but not limited to the covenant of good faith and fair dealing implied in that agreement.

166.   Hilton has been damaged by DXC's breach of Grant G in an amount to be determined at trial but believed to be not less than $439,377.92.

## COUNT FIVE
### Breach of Contract:  Grant H

167.    Plaintiff Stephen J. Hilton repeats, re-alleges and incorporates by reference the foregoing allegations as if set forth fully and again herein.

168.    On or about May 31, 2017, DXC granted Hilton 9,577 Restricted Stock Units in DXC ("Grant H").  That grant agreement is attached Exhibit H.  Grant H was made pursuant to the DXC Technology Company 2017 Omnibus Incentive Plan, which is attached as Exhibit O.

169.    Pursuant to paragraphs 1 and 2(a) of the grant agreement for Grant H, and pursuant to paragraph 1(h) of Appendix A of that grant, one-third of the Restricted Stock Units were to vest on May 31, 2018.

170.    However, in about May 2018, DXC unilaterally altered the vesting dates of the restricted stock-units that Hilton had been granted pursuant to Grant H.  Specifically, as to those units that were to vest on May 31, 2018, DXC unilaterally changed the vesting date to July 27, 2018. Nothing in the grant agreement for Grant H or in the DXC Technology Company 2017 Omnibus Incentive Plan permitted such an alteration of the vesting date.

171.     In June 2018, DXC spun off its U.S. Public Sector unit.  Upon information and belief, upon the consummation of that transaction, the unvested Restricted Stock Units in DXC Hilton had been granted pursuant to Grant H were adjusted to 11,072 Restricted Stock Units in DXC, with one third vesting (due to DXC's improper alteration of the date) on July 27, 2018, one third in May 2019, and one third in May 2020.

172.    On or about July 20, 2018, DXC terminated Hilton without "Cause" as that term is defined in the grant agreement for Grant H.

32

173.    Upon his termination, DXC cancelled and/or deleted all 11,072 Restricted Stock Units in DXC that Hilton had been granted under Grant H, including 3,691 Restricted Stock Units that should have vested on May 31, 2018.

174.    Hilton fully performed all of his obligations under Grant H.

175.    DXC breached its obligations under Grant H, including but not limited to the covenant of good faith and fair dealing implied in that agreement.

176.    Hilton has been damaged by DXC's breach of Grant H in an amount to be determined at trial but believed to be not less than $321,264.64.

## COUNT SIX
### Breach of Contract:  Grant K

177.    Plaintiff Stephen J. Hilton repeats, re-alleges and incorporates by reference the foregoing allegations as if set forth fully and again herein.

178.    On or about June 15, 2017, DXC granted Hilton 3,181 Restricted Stock Units in DXC ("Grant K").  That grant agreement is attached Exhibit K.  Grant K was made pursuant to the DXC Technology Company 2017 Omnibus Incentive Plan, which is attached as Exhibit O.

179.    Pursuant to paragraphs 1 and 2(a) of the grant agreement for Grant H, and pursuant to paragraph 1(h) of Appendix A of that grant, DXC was to settle all of the Restricted Stock Units granted pursuant to Grant K on June 15, 2018 "or as soon as practicable thereafter."

180.    However, in about May 2018, DXC unilaterally altered the vesting dates of the restricted stock-units that Hilton had been granted pursuant to Grant L.  Specifically, DXC unilaterally changed the vesting date to July 27, 2018.  Nothing in the grant agreement for Grant K or in the DXC Technology Company 2017 Omnibus Incentive Plan permitted such an alteration of the vesting date.

181.    In June 2018, DXC spun off its U.S. Public Sector unit.  Upon information and belief, upon the consummation of that transaction, the unvested Restricted Stock Units in DXC Hilton had been granted pursuant to Grant K were adjusted to 3,677 Restricted Stock Units in DXC, vesting (due to DXC's improper alteration of the date) on July 27, 2018.

182.    On or about July 20, 2018, DXC terminated Hilton without "Cause" as that term is defined in the grant agreement for Grant K.

183.    Upon his termination, DXC cancelled and/or deleted all 3,677 Restricted Stock Units in DXC that Hilton had been granted under Grant K.

184.    Hilton fully performed all of his obligations under Grant K.

185.    DXC breached its obligations under Grant K, including but not limited to the covenant of good faith and fair dealing implied in that agreement.

186.    Hilton has been damaged by DXC's breach of Grant H in an amount to be determined at trial but believed to be not less than $320,046.08.

## COUNT SEVEN
### Breach of Contract:  Grant L

187.    Plaintiff Stephen J. Hilton repeats, re-alleges and incorporates by reference the foregoing allegations as if set forth fully and again herein.

188.    On or about June 15, 2017, DXC granted Hilton 18,272 Restricted Stock Units in DXC ("Grant L").  That grant agreement is attached Exhibit L.  Grant L was made pursuant to the DXC Technology Company 2017 Omnibus Incentive Plan, which is attached as Exhibit O.

189.    Pursuant to paragraphs 1 and 2(a) of the grant agreement for Grant L, and pursuant to paragraph 1(h) of Appendix A of that grant, one-third of the Restricted Stock Units were to vest on June 15, 2018.

190.    However, in about May 2018, DXC unilaterally altered the vesting dates of the restricted

stock-units that Hilton had been granted pursuant to Grant L.  Specifically, as to those units that

were to vest on June 15, 2018, DXC unilaterally changed the vesting date to July 27, 2018.

Nothing in the grant agreement for Grant L or in the DXC Technology Company 2017 Omnibus

Incentive Plan permitted such an alteration of the vesting date.

191.     In June 2018, DXC spun off its U.S. Public Sector unit.  Upon information and belief,

upon the consummation of that transaction, the unvested Restricted Stock Units in DXC Hilton

had been granted pursuant to Grant L were adjusted to 21,126 Restricted Stock Units in DXC,

with one third vesting (due to DXC's improper alteration of the date) on July 27, 2018, one third

in May 2019, and one third in May 2020.

192.    On or about July 20, 2018, DXC terminated Hilton without "Cause" as that term is

defined in the grant agreement for Grant L.

193.    Upon his termination, DXC cancelled and/or deleted all 21,126 Restricted Stock Units in

DXC that Hilton had been granted under Grant L, including 7,042 Restricted Stock Units that

should have vested on June 15, 2018.

194.    Hilton fully performed all of his obligations under Grant L.

195.    DXC breached its obligations under Grant L, including but not limited to the covenant of

good faith and fair dealing implied in that agreement.

196.    Hilton has been damaged by DXC's breach of Grant L in an amount to be determined at

trial but believed to be not less than $612,935.68.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Stephen J. Hilton respectfully requests an award, in favor of Plaintiff

Stephen J. Hilton and against Defendant DXC Technology Company, granting the following relief:

    (a)  An award of damages of not less than \$14,353,636.80;

    (b)  An award of interest on the judgment, including pre- and post-judgment interest; and

    (c)  Such other and further relief as to this Court appears necessary and proper.


## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated:        New York, New York
               February 6, 2019

                        Respectfully Submitted,

                        GRANOVSKY & SUNDARESH PLLC

By: _____

Alexander Granovsky, Esq.
Benjamin Rudolph Delson, Esq.
Granovsky & Sundaresh PLLC
48 Wall Street, 11th Floor
New York, New York 10005
(646) 524-6001
ag@g-s-law.com
delson@g-s-law.com
*Attorneys for Plaintiff Stephen J. Hilton*