UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STEPHEN J. HILTON,<br><br>              Plaintiff,<br><br>       -vs-<br><br>DXC TECHNOLOGY COMPANY,<br><br>              Defendant. | Civil Action No.: 19-cv-1157 (PKC)<br><br>**ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM** |

Defendant DXC Technology Company ("Defendant" or "DXC"), by and through its undersigned counsel, respectfully submits its Answer, Affirmative Defenses, and Counterclaim to Plaintiff Stephen J. Hilton's Complaint and Jury Demand ("Complaint").  Except as expressly admitted herein, DXC denies each and every allegation contained in the Complaint.  With respect to the numbered paragraphs of the Complaint, DXC states as follows:

1.      Denied.

2.      Denied.

3.      Admit only that DXC is a Fortune 500 company; that its now-subsidiary CSC hired Hilton in 2015; and that DXC was formed through a merger involving CSC, and deny the remainder of the allegations in paragraph 3.

4.      Admit only that Hilton was paid a substantial salary and participated in a severance plan that is irrelevant to this case, and deny the remaining allegations of paragraph 4.

5.      Admit only that CSC and DXC granted Hilton equity including stock; state that the terms of the equity grants speak for themselves and that DXC has not breached those terms; and deny the remaining allegations of paragraph 5.

6.      Denied.

7.      Admit only that Mr. Lawrie is CEO of DXC and that Hilton was his direct report, and that Mr. Lawrie terminated Hilton for Cause, and deny the remaining allegations in paragraph 7.

8.      Admit only that Hilton was an at-will employee who could be fired at any time for any reason, and that Mr. Lawrie was dissatisfied was Hilton's substantial and willful failure to render services in accordance with the terms of his employment, and deny the remaining allegations in paragraph 8.

9.      Admit only that CSC and DXC expect its employees to speak honestly without fear of retaliation and to chart a profitable course for, and act in the best interests of, the company, and that CSC and DXC do not retaliate against employees; and deny the remaining allegations in paragraph 9.

10.     Denied.

11.     Denied.

12.     Denied.

13.     Admit only that Hilton was terminated for Cause as defined in the severance agreement (which is irrelevant to this case) and in the stock grant agreements and that the terms of those agreements speak for themselves; and deny the remaining allegations of paragraph 13.

14.     DXC admits that Hilton is an individual but is without sufficient knowledge or information to admit or deny the remaining allegations contained in paragraph 14, and therefore denies them.

15.     Admit.

16.     Admit.

17.     Admit that after the change in control, Hilton's title at DXC was Executive Vice President, Global Delivery Organization.

18.     Admit the first sentence of paragraph 18.  The second sentence of paragraph 18 sets forth a legal conclusion to which no response is required.

19.     Denied.

20.     Admit.

21.     Admit.

22.     DXC admits it has a company website, and states that the statements on that website speak for themselves.

23.     DXC denies the first sentence of paragraph 23 and admits the second sentence.

24.     Paragraph 24 sets forth legal conclusions to which no response is required.

25.     The first sentence of paragraph 25 sets forth a legal conclusion to which no response is required.  DXC admits the second and third sentence of paragraph 25.

26.     DXC admits the first sentence of paragraph 26.  DXC is without sufficient knowledge or information to admit or deny the allegations contained in the second sentence of paragraph 26, and therefore denies them.

27.     DXC is without sufficient knowledge or information about what Forrest  "saw," "thought" or "suggested" to Hilton to admit or deny the allegations contained in paragraph 27, and therefore denies them.

28.     Admit.

29.     Denied.

30.     Denied.

31.     DXC is without sufficient knowledge or information as to what Hilton "could tell" to admit or deny the allegations contained in the first sentence of paragraph 31, and therefore denies them.  DXC admits the second sentence of paragraph 31.

32.     DXC admits CSC wanted (and wants) senior management to feel free to be honest and direct with each other, and to maximize shareholder value, without worrying about their own immediate professional futures, and denies the remainder of paragraph 32.

33.     DXC admits only that CSC offered Hilton participation in a severance plan and equity grants and states that the terms of those documents speak for themselves, and denies the remainder of paragraph 33.

34.     DXC admits that CSC offered Hilton employment pursuant to an offer letter, and states that the terms of the offer letter speak for themselves, and denies all other allegations in paragraph 34.

35.     DXC admits that CSC offered Hilton employment pursuant to an offer letter and states that the terms of the offer letter speak for themselves; is without sufficient knowledge or information as to what Hilton "saw" to admit or deny the allegation contained in the third sentence of paragraph 35, and therefore denies that allegation; and denies the remaining allegations in paragraph 35.

36.     DXC admits that CSC entered into a Senior Management And Key Employee Severance Agreement with Hilton which makes reference to a Severance Plan, and states that the terms of that agreement and the Severance Plan speak for themselves, and, regardless, are irrelevant to this case, and denies all other allegations in paragraph 36.

37.     DXC admits that CSC entered into a Severance Agreement with Hilton, and states that the terms of that agreement and the Severance Plan speak for themselves, and, regardless, are irrelevant to this case, and denies all other allegations in paragraph 37.

38.     DXC admits that CSC made stock grants to Hilton in May 2015, and states that the terms of those grants speak for themselves, and denies all other allegations in paragraph 38.

39.     DXC admits that CSC made stock grants to Hilton in May 2015 and states that the terms of those grants speak for themselves, and denies the remaining allegations in paragraph 39.

40.     DXC admits that Hilton was employed by CSC as Executive Vice President and General Manager of GIS and was subject to the reporting requirements of Section 16 of the Securities Exchange Act, and denies all other allegations of paragraph 40.

41.     Denied.

42.     Denied.

43.     Denied.

44.     Denied.

45.     Denied.

46.     Denied.

47.     DXC admits that CSC made stock grants to Hilton in 2015 and 2016 and states that the terms of those grants speak for themselves, and denies all other allegations in paragraph 47.

48.     DXC admits that CSC made stock grants to Hilton in 2015 and 2016, and states that the terms of those grants speak for themselves, and denies all other allegations in paragraph 48.

49.     Admit that in 2015 and 2016 the CSC Board contemplated a merger with several potential partners, including the Enterprise Services Division of Hewlett Packard, and denies all other allegations in paragraph 49.

50.     DXC admits only that the merger which formed DXC was publicly announced in May 2016 and successfully concluded in April 2017, and denies all other allegations of paragraph 50.

51.     Denied.

52.     Admit.

53.     DXC admits first sentence and that the grants identified in the second sentence of paragraph 53 have been distributed in full to Hilton, and states that the terms of those grants speak for themselves, and denies all other allegations in paragraph 53.

54.     DXC denies the first sentence of paragraph 54, and admits the second sentence.

55.     DXC admits that it made stock grants to Hilton in 2017 and states that the terms of those grants speak for themselves, and denies all other allegations in paragraph 55.

56.     Admit.

57.     DXC admits that CSC engaged consultants in the ordinary course of its business including McKinsey and Heidrick, and denies all other allegations in paragraph 57.

58.     Denied.

59.     Admit.

60.     Denied.

61.     Admit that Hilton's title following the merger was Executive Vice President, Global Delivery Organization and that his salary was raised to $700,000 per year.

62.     Denied.

63.     Denied.

64.     Denied.

65.     Admit.

66.     Admit.

67.     Denied.

68.     Denied.

69.     Denied.

70.     Denied.

71.     DXC is without sufficient knowledge or information as to what Hilton "felt" or comments he may have made to McKinsey consultants to admit or deny the allegations contained in the third and fourth sentences of paragraph 71, and therefore denies those allegations; and denies the remaining allegations in paragraph 71.

72.     As to the allegation first sentence of paragraph 72, DXC is without sufficient knowledge or information to admit or deny what Hilton "noticed," and therefore denies the allegation.  DXC admits the allegations in the second sentence of paragraph 72, and denies the allegations in the third sentence of paragraph 72.

73.     Denied.

74.     DXC is without sufficient knowledge or information to admit or deny the allegations in paragraph 74, and therefore denies the allegations, and further denies that Lawrie mistreated his subordinates or that his treatment of them "grew worse," and denies all other allegations in paragraph 74.

75.     DXC denies the allegations in the first, third, and fourth sentences of paragraph 75, and as to the second sentence, is without sufficient knowledge or information to admit or deny what Hilton "felt," and therefore denies the allegation in the second sentence of paragraph 75.

76.     DXC admits only that Hilton and Lawrie had dinner in 2017, and denies the remaining allegations in paragraph 76.

77.     Denied.

78.     Denied.

79.     Denied.

80.     DXC denies the first sentence of paragraph 80, and as to the second sentence of paragraph 80, admits that the DXC Severance Plan was filed with the SEC and states that the

terms of the Severance Plan speak for themselves, and denies all other allegations in paragraph 80.

81.     Denied.

82.     DXC is without sufficient knowledge or information to admit or deny what Hilton "reported" and therefore denies the allegation in paragraph 82, and further denies Hilton's blatant mischaracterization of his purported conversation with Lawrie.

83.     Denied.

84.     Denied.

85.     Denied.

86.     Denied.

87.     Denied.

88.     Denied.

89.     DXC denies the first sentence of paragraph 89.  As to the second sentence of paragraph 89, DXC denies that Hilton was "being set up," and is without sufficient knowledge or information to admit or deny the remaining allegations of paragraph 89, and therefore denies them.

90.     DXC admits that it restructured the Delivery Organization in late 2017/early 2018, which resulted in Hilton having fewer direct reports, and denies the remaining allegations in paragraph 90.

91.     Denied.

92.     Denied.

93.     Denied.

94.     Denied.

95.     Denied.

96.     Denied.

97.     DXC admits the first two sentences of paragraph 97, and as to the third sentence, admits that DXC gave Hilton a letter at the May 15, 2018, meeting, and states that the terms of that letter speak for themselves, and denies all other allegations in paragraph 97.

98.     DXC admits that it gave Hilton a letter on May 15 and states that the terms of that letter speak for themselves; denies that the reasons provided for Hilton's termination for Cause were pretextual or untrue in any way; and denies the remaining allegations of paragraph 98.

99.     DXC admits that it gave Hilton a letter on May 15 and states that the terms of that letter speak for themselves, and denies the remaining allegations of paragraph 99.

100.    DXC admits that it gave Hilton a letter on May 15 and states that the terms of that letter speak for themselves, and denies the remaining allegations of paragraph 100.

101.    Denied.

102.    Denied.

103.    DXC admits that it gave Hilton a letter on May 15 and states that the terms of that letter speak for themselves, and denies the remaining allegations of paragraph 103.

104.    DXC denies the allegations in the first sentence of paragraph 104, and admits the allegations in the remaining sentences.

105.    DXC admits it provided a letter to Hilton on July 17, 2018, and states that the terms of the letter speak for themselves, and denies all other allegations in paragraph 105.

106.    DXC admits that by virtue of his termination for Cause and consistent with the terms of all applicable agreements, Hilton was not paid anything under his Severance Agreement and his unvested equity was forfeited, and denies the remaining allegation of paragraph 106.

107.   Denied.

108.   As to the allegations in the first sentence of paragraph 108, DXC admits that Fidelity manages certain stock grants issued by DXC, and states that it is without sufficient knowledge or information to admit or deny the remaining allegations contained in the first sentence of paragraph 108, and therefore denies those allegations.  As to the second and third sentences of paragraph 108, DXC admits that some units were initially scheduled to vest in late May and mid-June 2018 and that those dates were put on a temporary administrative hold pending the outcome of the cure period identified in the May 15, 2018 Notice of Termination; is without sufficient knowledge or information as to what Hilton "observed" to admit or deny that allegation and therefore denies it; and denies the remaining allegations in paragraph 108.

109.   DXC is without sufficient knowledge or information to admit or deny the allegations contained in paragraph 109, and therefore denies them.

110.   Denied.

111.   Denied.

112.   Denied.

113.   Denied.

114.   DXC admits that in this lawsuit Hilton is suing DXC for compensation under certain equity grants; denies that it terminated him without Cause; and further denies that it owes him any such compensation; and denies the remaining allegations in paragraph 114.

115.   DXC denies the first sentence of paragraph 115.  As to the second sentence, DXC admits there is no claim under the Severance Agreement at issue in this lawsuit, and states that the terms of the Severance Agreement speak for themselves and, regardless, are irrelevant to this case, and denies the remaining allegations in paragraph 115.

## COUNT ONE
**Breach of Contract: Grant C**

116.    DXC incorporates its previous responses as if fully set forth herein.

117.    DXC admits that that CSC and Hilton entered into an agreement on or about December 15, 2015, pursuant to the Computer Science Corporation 2011 Omnibus Incentive Plan, granting Hilton certain equity under the terms and conditions of the grant agreement and the Computer Science Corporation 2011 Omnibus Incentive Plan, and states that the terms of the grant agreement and the Computer Science Corporation 2011 Omnibus Incentive Plan speak for themselves, and denies the remaining allegations in paragraph 117.

118.    DXC states that the terms of the grant agreement speak for themselves, and denies the remaining allegations in paragraph 118.

119.    Admit.

120.    DXC denies the allegation in the first sentence of paragraph 120, and admits the allegations in the second sentence.

121.    Denied.

122.    Denied.

123.    Denied.

124.    Denied.

125.    Denied.

126.    Denied.

## COUNT TWO
**Breach of Contract: Grant D**

127.    DXC incorporates its previous responses as if fully set forth herein.

128.    DXC admits that CSC and Hilton entered into an agreement on or about May 27, 2016, pursuant to the Computer Science Corporation 2011 Omnibus Incentive Plan, granting Hilton

certain equity under the terms and conditions of the grant agreement and the Computer Science Corporation 2011 Omnibus Incentive Plan, and states that the terms of the grant agreement and the Computer Science Corporation 2011 Omnibus Incentive Plan speak for themselves, and denies the remaining allegations in paragraph 128.

129.    DXC states that the terms of the grant agreement speak for themselves, and denies the remaining allegations in paragraph 129.

130.    Admit.

131.    Admit.

132.    Admit, except that the portion of units that were to vest in 2019 but for Hilton's termination for Cause were to have vested on May 27.

133.    DXC admits that a portion of the units granted under Grant D had an initial vesting date of May 27, 2018 and that vesting date was put on a temporary administrative hold pending the outcome of the cure period identified in the May 15, 2018 Notice of Termination, and denies the remaining allegations in paragraph 133.

134.    DXC denies the allegation in the first sentence of paragraph 134 and admits the allegations in the second sentence, except that DXC denies that it improperly altered the vesting date for Grant D.

135.    Denied.

136.    Denied.

137.    Denied.

138.    Denied.

139.    Denied.

140.    Denied.

## COUNT THREE
### Breach of Contract: Grant E

141.    DXC incorporates its previous responses as if fully set forth herein.

142.    DXC admits that that CSC and Hilton entered into an agreement on or about May 27, 2016, pursuant to the Computer Science Corporation 2011 Omnibus Incentive Plan, granting Hilton certain equity under the terms and conditions of the grant agreement and the Computer Science Corporation 2011 Omnibus Incentive Plan, and states that the terms of the grant agreement and the Computer Science Corporation 2011 Omnibus Incentive Plan speak for themselves, and denies all other allegations in paragraph 142.

143.    Admit.

144.    Admit, except that the units that vested in 2017 vested in April 2017.

145.    Admit.

146.    DXC admits that a portion of the units granted under Grant E had an initial vesting date of May 27, 2018 and that vesting date was put on a temporary administrative hold pending the outcome of the cure period identified in the May 15, 2018 Notice of Termination, and denies the remaining allegations in paragraph 146.

147.    DXC denies the allegation in the first sentence of paragraph 147, and admits the allegations in the second sentence, except that DXC denies that it improperly altered the vesting date for Grant E.

148.    Denied.

149.    Denied.

150.    Denied.

151.    Denied.

152.    Denied.

153.    Denied.

## COUNT FOUR
### Breach of Contract: Grant G

154.    DXC incorporates its previous responses as if fully set forth herein.

155.    DXC admits that that CSC and Hilton entered into an agreement on or about May 27,

2016, pursuant to the Computer Science Corporation 2011 Omnibus Incentive Plan, granting

Hilton certain equity under the terms and conditions of the grant agreement and the Computer

Science Corporation 2011 Omnibus Incentive Plan, and states that the terms of the grant

agreement and the Computer Science Corporation 2011 Omnibus Incentive Plan speak for

themselves, and denies all other allegations in paragraph 155.

156.    Admit.

157.    Admit, except that the units that vested in 2017 vested in April 2017.

158.    Admit.

159.    DXC admits that a portion of the units granted under Grant G had an initial vesting date

of May 27, 2018 and that vesting date was put on a temporary administrative hold pending the

outcome of the cure period identified in the May 15, 2018 Notice of Termination, and denies the

remaining allegations in paragraph 159.

160.    DXC denies the allegation in the first sentence of paragraph 160 and admits the

allegations in the second sentence,  except that DXC denies that it improperly altered the vesting

date for Grant G.

161.    Denied.

162.    Denied.

163.    Denied.

164.    Denied.

165.    Denied.

166.    Denied.

**COUNT FIVE**
**Breach of Contract: Grant H**

167.    DXC incorporates its previous responses as if fully set forth herein.

168.    DXC admits that that DXC and Hilton entered into an agreement on or about May 31, 2017, pursuant to the DXC Technology Company 2017 Omnibus Incentive Plan, granting Hilton certain equity under the terms and conditions of the grant agreement and the DXC Technology Company 2017 Omnibus Incentive Plan, and states that the terms of the grant agreement and the DXC Technology Company 2017 Omnibus Incentive Plan speak for themselves, and denies all other allegations in paragraph 168.

169.    DXC states that the terms of the grant agreement speak for themselves, and denies all other allegations in paragraph 169.

170.    DXC admits that a portion of the units granted under Grant H had an initial vesting date of May 31, 2018 and that vesting date was put on a temporary administrative hold pending the outcome of the cure period identified in the May 15, 2018 Notice of Termination, and denies the remaining allegations in paragraph 170.

171.    DXC denies the allegation in the first sentence of paragraph 171, and admits the allegations in the second sentence, except that DXC denies that it improperly altered the vesting date for Grant H.

172.    Denied.

173.    Denied.

174.    Denied.

175.    Denied.

176.    Denied.

## COUNT SIX
### Breach of Contract: Grant K

177.    DXC incorporates its previous responses as if fully set forth herein.

178.    DXC admits that that DXC and Hilton entered into an agreement on or about June 15, 2017, pursuant to the DXC Technology Company 2017 Omnibus Incentive Plan, granting Hilton certain equity under the terms and conditions of the grant agreement and the DXC Technology Company 2017 Omnibus Incentive Plan, and states that the terms of the grant agreement and the DXC Technology Company 2017 Omnibus Incentive Plan speak for themselves, and denies all other allegations in paragraph 178.

179.    DXC states that the terms of the grant agreement speak for themselves, and denies all other allegations in paragraph 179.

180.    DXC admits that the units granted under Grant K had an initial vesting date of June 15, 2018 or as soon as practicable thereafter, and the vesting date was put on a temporary administrative hold pending the outcome of the cure period identified in the May 15, 2018 Notice of Termination, and denies the remaining allegations in paragraph 180.

181.    DXC denies the allegation in the first sentence of paragraph 181, and admits the allegations in the second sentence, except that DXC denies that it improperly altered the vesting date for Grant K.

182.    Denied.

183.    Denied.

184.    Denied.

185.    Denied.

186.    Denied.

## COUNT SEVEN
### Breach of Contract: Grant L

187.    DXC incorporates its previous responses as if fully set forth herein.

188.    DXC admits that that DXC and Hilton entered into an agreement on or about June 15, 2017, pursuant to the DXC Technology Company 2017 Omnibus Incentive Plan, granting Hilton certain equity under the terms and conditions of the grant agreement and the DXC Technology Company 2017 Omnibus Incentive Plan, and states that the terms of the grant agreement and the DXC Technology Company 2017 Omnibus Incentive Plan speak for themselves, and denies all other allegations in paragraph 188.

189.    DXC states that the terms of the grant agreement speak for themselves, and denies all other allegations in paragraph 189.

190.    DXC admits that a portion of the units granted under Grant E had an initial vesting date of June 15, 2018 and that vesting date was put on a temporary administrative hold pending the outcome of the cure period identified in the May 15, 2018 Notice of Termination, and denies the remaining allegations in paragraph 190.

191.    DXC denies the allegation in the first sentence of paragraph 191, and admits the allegations in the second sentence,  except that DXC denies that it improperly altered the vesting date for Grant L, and states that the portion of units scheduled to vest in 2019 and 2020 but for Hilton's termination for Cause were scheduled to vest in June (not May) of the relevant years.

192.    Denied.

193.    Denied.

194.    Denied.

195.    Denied.

196.   Denied.

With respect to the prayer for relief in the Paragraph entitled "WHEREFORE," DXC

denies that Hilton is entitled to any form of relief whatsoever.

## AFFIRMATIVE DEFENSES

1.   The Complaint fails to state a cause of action against DXC upon which relief can be

granted.

2.   DXC has fully performed under all applicable agreements.

3.   DXC's performance under the contracts, obligations, and/or agreements alleged in the

Complaint is waived, excused, and/or rendered moot by Hilton's breach of the alleged contracts

and/or agreements, Hilton's breach of the implied covenant of good faith and fair dealing, the

non-occurrence of a condition precedent, and/or Hilton's breaches of obligations owed DXC in

connection with his employment with DXC, including his obligations with respect to

nondisclosure of confidential information.

4.   DXC's performance under the contracts, obligations, and/or agreements alleged in the

Complaint is waived, excused, and/or rendered moot by Hilton's first material breach of the

alleged contracts and/or agreements.

5.    DXC's performance under the contracts, obligations, and/or agreements alleged in the

Complaint was prevented, made impossible, or otherwise excused as a result of acts or omissions

of Hilton, his representatives, and/or his agents.

6.   The Complaint, and the claims and causes of action alleged therein, are barred by the

doctrine of unclean hands.

7.   The Complaint, and the claims and causes of action alleged therein, are barred because

Hilton acted in bad faith in performing under the contracts, obligations, and/or agreements

alleged in the Complaint and during the course of his employment with DXC.

8.      The Complaint, and the claims and causes of action alleged therein, are barred by Hilton's own fraudulent and deceitful conduct in performing under the contracts, obligations, and/or agreements alleged in the Complaint and during the course of his employment with DXC.

9.      Hilton is barred from recovery in whole or in part under the claims and causes of action alleged in the Complaint because DXC is entitled to a setoff or offset of amounts owed to DXC as a result of Hilton's own breaches of contract and/or tortious conduct.

10.     The Complaint, and the claims and causes of action alleged therein, are barred under the doctrine of satisfaction because DXC has paid all that is owed under the contracts, obligations, and/or agreements alleged in the Complaint.

11.     The Complaint, and the claims and causes of action alleged therein, are barred under the doctrine of frustration of purpose, because Hilton's actions in performing under the contracts, obligations, and/or agreements alleged in the Complaint and during the course of his employment prevented DXC from obtaining the benefits contemplated under the contract.

12.     DXC reserves the right to assert additional affirmative defenses in the event discovery and/or further analysis indicates that additional unknown and/or unstated defenses would be applicable.

## JURY DEMAND

DXC demands a trial by jury on all issues so triable.

WHEREFORE, having fully responded to Hilton's Complaint, DXC respectfully requests that this action be dismissed with prejudice; Hilton's demands for damages or other relief be denied; and DXC receive other relief that this Court deems just and proper.

## DEFENDANT DXC'S COUNTERCLAIM

Defendant DXC, through its undersigned counsel, and in accordance with Fed. R. Civ. P.

13, hereby asserts its counterclaim against Plaintiff Stephen J. Hilton, stating as follows

## NATURE OF THE ACTION

1.  DXC Technology Company ("DXC") is a leading, end-to-end Information Technology

services company, serving nearly 6,000 private and public-sector clients from a diverse array of industries

across 70 countries.  The company's technology independence, global talent and extensive partner network

serve its mission to deliver digital offerings and solutions to help clients harness the power of innovation

and change.

2.  In order to further its mission, in 2015, Computer Sciences Corporation ("CSC"), now a

wholly-owned subsidiary of DXC, hired Stephen J. Hilton as Executive Vice President and General

Manager of Global Infrastructure Services.  After the merger creating DXC, Hilton continued on as a top

Executive Vice President for DXC.

3.  In that position, DXC relied on Hilton to be a loyal officer of the company, acting always

in DXC's best interests in order to achieve the company's goals.  Yet rather than fulfill his responsibilities

to DXC, Hilton did just the opposite, substantially and willfully failing to perform his most basic

responsibilities to DXC.  Hilton did all of this, on information and belief, as part of a plan to retain millions

of dollars in planned compensation that, had he "chosen" to leave the company, he would have been

ineligible to receive.

4.  Further, Hilton flouted the terms of a special retention award agreement (the "Retention

Agreement") into which he entered with DXC, whereby DXC awarded Hilton special compensation in the

amount of $487,500; and in exchange, Hilton agreed to, among other things: (a) remain an employee in

good standing at DXC or an affiliated company for one year following the date of the award (the

"Retention Period") and (b) return the award in full to DXC in the event he quit or was terminated for "cause" within the Retention Period.

5.   During the Retention Period, Hilton failed satisfactorily to fulfill his employment responsibilities.  Accordingly, prior to the end of the Retention Period, DXC terminated his employment for cause.  To date, however, Hilton has not returned to DXC any portion of the award.

6.   By this action, DXC seeks an award of damages resulting from Hilton's breach of the Retention Agreement.

## PARTIES

7.   DXC is a Nevada corporation with its principal place of business at 1775 Tysons Boulevard in Tysons, Virginia.  It also maintains its principal New York office at 1 Rockefeller Plaza in the city of New York.

8.   Hilton, upon information and belief, is a citizen and resident of New York, residing at 360 Furman Street in Brooklyn, New York.  At the time DXC terminated Hilton's employment, he was DXC's Executive Vice President for Global Delivery.

## JURISDICTION AND VENUE

9.   The Court has subject matter jurisdiction over this counterclaim under 28 U.S.C. § 1332, because the matter in controversy exceeds $75,000, Hilton is a citizen of the State of New York, and DXC is a citizen of the State of Nevada and the Commonwealth of Virginia.  The court also has subject matter jurisdiction under 28 U.S.C. § 1367.

10.      Venue is proper in this Court under 28 U.S.C. § 1391.

## FACTS

11.      On or about March 3, 2015, DXC's current wholly-owned subsidiary, CSC, hired Hilton to serve as its Executive Vice President and General Manager of Global Infrastructure Services. Hilton served in that role until April 2017, when CSC merged to form DCX.

12.     Following the merger, Hilton remained an Executive Vice President for DXC, leading its "Deliver" division, where he was responsible for, among other things, managing more than a hundred thousand DXC employees in order to deliver DXC's services to thousands of clients around the world.

13.     Hilton was compensated generously for his role.  His base salary was $700,000 per year.  He was eligible to be considered for certain discretionary incentive bonuses.  And Hilton received numerous grants of stock options and restricted stock units from both CSC and DXC during his tenure.

14.     On June 7, 2017, in recognition of the critical role Hilton was supposed to play at DXC, it decided to award Hilton a special retention award.

15.     The terms of the special retention award are reflected in the Retention Agreement.

16.     Under the Retention Agreement, DXC awarded Hilton an award valued at $487,500 split between a cash payment of $243,750 and a grant of restricted stock units valued at $243,750, subject to delayed vesting.

17.     Under the terms of the Retention Agreement, Hilton's entitlement to the cash payment was conditioned upon his remaining an employee in good standing at DXC or an affiliated company for a period of one year following his receipt of the cash payment.  If Hilton voluntarily terminated his employment with DXC or if DXC terminated his employment for "cause" earlier than one year from the date of the cash payment, the Retention Agreement required Hilton to return the cash payment to DXC.

18.     On August 14, 2017, Hilton accepted the Retention Agreement.

19.     DXC made the cash payment to Hilton on or about September 1, 2017. Accordingly, under the terms of the Retention Agreement, if Hilton quit or was terminated for cause before September 1, 2018, he was required to return the cash payment to DXC.

20.     Notwithstanding the substantial compensation package DXC provided Hilton, he willfully failed, in many respects, to fulfill his most basic job responsibilities.

21.     In light of Hilton's willful and substantial performance failures, on May 15, 2018, DXC provided Hilton a notice of its intention to terminate his employment on 60 days' notice if he were unable to remedy his failures to perform.

22.     Even after receiving this notice, Hilton still continued to forsake his critical responsibilities.  Following receipt of the notice, Hilton undertook little to no effort whatsoever to remedy his performance failures and did not cure them

23.     Hilton's willful and substantial performance failures constituted "cause" within the meaning of the Retention Agreement.  As a result of these failures, DXC terminated Hilton for cause.

24.     Because DXC terminated Hilton's employment for cause less than one year after his receipt of the cash payment under the Retention Agreement, he is required to return it to DXC.

25.     Notwithstanding this requirement, and in breach of the Retention Agreement, Hilton has failed to return the $243,750 cash payment to DXC.

## COUNT I
## (FOR BREACH OF CONTRACT)

26.     The foregoing paragraphs 1 through 25 of this Complaint are incorporated by reference and re-alleged.

27.     The Retention Agreement constitutes a valid, binding, and enforceable contract between DXC and Hilton.

28.     DXC fully performed its obligations under the Retention Agreement by providing Hilton a cash payment of $243,750 on or about September 1, 2017, the retention of which was conditioned upon Hilton's remaining an employee in good standing at DXC or a DXC affiliate through September 1, 2018, and not being terminated for cause before that date.

29.     DXC terminated Hilton's employment for cause before September 1, 2018. Accordingly, , the Retention Agreement required Hilton to return the cash payment to DXC.

30.     Hilton has breached the Retention Agreement by failing to return the cash payment to DXC.

31.     Hilton's breach of the Retention Agreement has directly and proximately caused DXC damages in the amount of $243,750.

## JURY DEMAND

DXC demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, DXC respectfully requests that the Court grant judgment to DXC on all counts, and award it (1) compensatory damages of not less than $243,750, (2) pre- and post-judgment interest, and (3) all other relief the Court finds just and proper.

Dated: April 8, 2019
Washington, District of Columbia

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

By: _/s/   Nigel Wilkinson_____

    Deborah P. Kelly (admission pending)
    Nigel Wilkinson (admitted *pro hac vice*)
    David T. Schur (admitted *pro hac vice*)
    1050 Connecticut  Ave. NW, Suite 600
    Washington, DC 20036
    Telephone: (202) 585-6500
    Facsimile: (202) 585-6600
    NWilkinson@manatt.com
    DSchur@manatt.com
    *Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 8, 2019, the forgoing Defendant DXC Technology Company's

Answer, Affirmative Defenses, and Counterclaim was electronically with the Clerk of Court

using the CM/ECF system, which will send notification of such filing to:

Alexander Granovsky
Benjamin Rudolph Delson
Granovsky & Sundaresh PLLC
48 Wall Street, 11th Floor
New York, New York 10005
(646) 524-6001
Attorneys for Claimant Stephen J. Hilton

　　　　　　/s/　Nigel Wilkinson_____
　　　　　　Nigel Wilkinson